IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| IN MARK A. JALAJEL and ANN MARIE JALAJEL | ) ) ) ) ) ) ) | Docket Number 09-11453-RGM Chapter 7 |
| Debtors | | |
| MICHAEL J. TANNER, JOSEPH P. QUIGG, RENEE M. QUIGG, WILLIAM O. WARREN, SUSAN K. WARREN, MELISSA D. PILLA, BRIAN J. VIOLA, TAMMY A. VIOLA, JULIE DAY, CHRISTOPHER COGNETTI, MICHELLE COGNETTI, KEVIN FORD, JOHN R. GODDARD, PAMELA GODDARD, CARL DUGAN, ERIN L. DUGAN, SHARON MIKOLAJYCZK, TODD MIKOLAJYCZK, RAY PUGSLEY, CATHY PUGSLEY, ROGER BALDUCCI, EDWARD BLAKE, MARRY ELLEN BLAKE, CHRISTINA BLAKE, CHRIS MARTIN, DAVID PETRUZZI, THEODORE HOOTEN, MICHAEL HARRIS JOHN R. HURLIHY, MAX SAROPH, KEVIN PHELPS BRET ANDERSON, and DAVID PETRUZZI | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs | ) | |
| v. | ) ) | Adversary Proceeding 09-0_____-RGM |
| MARK A. JALAJEL | ) ) | |
| Defendant | ) ) | |

Counsel Plaintiffs:

John P. Forest, II, VSB# 33089
[email: jforest@stahlzelloe.com]
STAHLZELLOE, P.C.
11350 Random Hills Road, Suite 700
Fairfax, Virginia 22030
Telephone: (703) 691-4940
Facsimile: (703) 691-4942

**COMPLAINT TO OBJECT TO DISCHARGEABILITY
PURSUANT TO 11 U.S.C. §§ 523(A)(2)(A) AND (B)**

Plaintiffs, pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B), Federal Rules of Bankruptcy Procedure 7001, *et seq.*, and Federal Rules of Civil Procedure 1, *et seq.*, set forth their complaint objecting to the dischargeability of certain debts of Mark A. Jalajel ("Jalajel") and as grounds for this objection and complaint state as follows:

**PARTIES**

1. Michael J. Tanner ("Tanner") is a resident of Virginia.

2. Joseph P. and Renee M. Quigg (the "Quiggs") are residents of Virginia.

3. William K. and Susan O. Warren (the "Warrens") are residents of Virginia.

4. Melissa D. Pilla ("Pilla") is an individual resident of Virginia.

5. Brian J. and Tammy A. Viola (the "Violas") are residents of Virginia.

6. Jule Day is an individual resident of Virginia.

7. Christopher and Michelle Cognetti (the "Cognettis") are residents of Massachusetts.

8. Kevin Ford ("Ford") is an individual resident of Virginia.

9. John Goddard and Pamela Goddard (the "Goddards") are residents of Virginia.

10. Carl Dugan and Erin Dugan (the "Dugans") are residents of Virginia.

11. Sharon and Todd Mikolajyczk (the "Mikoalajyczks") are residents of New Jersey.

12. Ray and Cathy Pugsley (the "Pugsleys") are residents of Virginia.

13. Roger Balducci ("Balducci") is a resident of Virginia.

14. Ed and Mary Ellen Blake (the "Blakes") are residents of New Jersey.

15. Christina Blake ("Christina") is a resident of New Jersey.

16. Chris Martin ("Martin") is a resident of Virginia.

17. Theodore Hooten ("Hooten") is a resident of California.

18. Michael Harris ("Harris") is a resident of California.

19. John R. Hurlihy ("Hurlihy") is a resident of Massachusetts.

20. Max Sartoph ("Sartoph") is a resident of Maryland.

21. Bret Anderson ("Anderson") is a resident of California.

22. Kevin Phelps ("Phelps") is a resident of Maryland.

23. David Petruzzi ("Petruzzi") is a resident of Virginia.

24. Jalajel is a debtor in *In re Mark A. Jalajel, et al.*, U.S. Bankruptcy Court, E.D. Va. Alexandria Division Docket Number 09-11453-RGM and is a resident of Virginia.

## JURISDICTION

25. This Court has jurisdiction over this complaint and over these parties pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 523. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(J). This adversary proceeding relates to a voluntary petition (the "Petition") for relief pursuant to Chapter 7 of Title 11 of the U.S. Code filed by Jalajel on February 24, 2009.

## FACTS

26. Jalajel was a member or the managing member and the President of Total Realty Management, LLC ("TRM"). He designed and controlled the activities, marketing practices and the day-to-day business of TRM and its agents. As such he received a direct benefit as a result of any income and revenues received by TRM through TRM's transactions with Plaintiffs.

27. Jalajel orchestrated and operated a scheme of purchasing and immediately reselling unimproved residential lots through TRM to inexperienced real estate purchasers

28. TRM's business, and its sole purpose for existence, was to purchase unimproved lots from developers at their fair market prices, and then immediately to resell them to purchasers at grossly inflated prices. Because each sale was so lucrative, Jalajel used every method at his

disposal to sell as many lots as possible.

29. To accomplish his plan, Jalajel needed to (a) mislead each purchaser regarding virtually every material aspect of the transaction; and (b) procure for the purchaser the financing for this fraudulent transaction.

30 These goals were accomplished by (a) entering into an arrangement with certain appraisers and loan officers, (b) using a clever and fraudulent marketing strategy that relied heavily upon misrepresentation; (c) controlling the loan application process; and (d) controlling the settlement process.

31 The first step in Jalajel's scheme was to verify that potential lenders would be able to obtain lot appraisals for amounts grossly in excess of the lots' then fair market value. This step was crucial because the lots Jalajel anticipated selling for a purchase price typically between $300,000 and $400,000 were in fact available to the general public for approximately $150,000.

32. To create inflated appraisals, Jalajel orchestrated sham transactions, in which lots were purchased for prices grossly in excess of the fair market value. These transactions were for the sole purpose of establishing inflated prices for future lot sales. Jalajel made arrangements with certain appraisers to ensure appraisals would be generated using comparable sales at the inflated price, rather than the numerous arms-length transactions occurring at the much lower fair market price. Since Jalajel was able to direct purchasers to certain cooperating loan officers, it could be certain that only appraisers who were participants in the illegal agreement to generate inflated appraisals would be used.

33. Confident that exaggerated appraisals could be obtained, Jalajel engaged in a bold marketing scheme every facet of which was based upon deception and misrepresentation.

34. Jalajel used a number of strategies to convince purchasers to use TRM for their lot purchases. TRM offered to make the down payments, to pay the closing costs, and to refund to

the purchasers after closing an amount equal to their first year or two of mortgage payments. These financial incentives were designed to create feelings in the purchasers that purchases involved little personal financial risk. To explain to purchasers its ability to make such offers, TRM represented that it was able to buy lots at half of the fair market value because it purchased the lots in bulk. This representation was completely untrue.

35    In its marketing scheme, TRM made numerous misrepresentations. TRM told potential purchasers that lots in a certain development were selling out very soon; it told purchasers that they would be able to resell their lots easily for a profit; it represented that it owned the lots that it offered for sale to purchasers; and it held itself out as acting as the purchasers' real estate agent. None of these representations was true.

36.    Wholesale misrepresentation and rigged appraisals, however, were not enough to guarantee the success of Jalajel's enterprise. To do that, TRM would have to be intimately involved in and control the loan process. TRM would direct purchasers to loan officers with whom TRM was working. TRM would control the entire process, including dealing directly with the loan officers. TRM was thus able to manipulate the purchasers' financial information so that they would qualify for loans. The loan officers from participating lenders obtained the appraisals from the stable of appraisers TRM knew would generate inflated appraisals. This ensured that purchasers would be able to qualify for loans for as many lots as they wanted. TRM refused to sell lots to purchasers who would not use TRM's loan officers.

37.    The net effect of TRM's arrangement with the loan officers was (a) to qualify purchasers for loans for which they would not normally qualify; (b) to create a mistaken belief in the purchasers that the transactions were legitimate, fair market value transactions; and (c) to facilitate significant financial inducements with which TRM could induce sales.

39.    Once financing was obtained from a participating lender, TRM proceeded to

settlement. As TRM had no lots in its inventory and did not want to use its own funds for lot acquisition, TRM would concurrently close its lot acquisition and its out-sale at the same settlement company, with the deeds being recorded on the same day and within minutes of each other. At settlement, TRM would use part of the sales proceeds from each lot to pay for its acquisition of that lot, along with closing costs. After settlement, TRM would use part of the sales proceeds to fund the first year or two of mortgage payments it gave to the purchaser, and it would use some proceeds to pay referral fee commissions. The remainder was TRM's profit.

40. TRM sold unimproved lots of real estate to purchasers, including Plaintiffs, at well above fair market prices.

41. TRM induced individuals to purchase the unimproved real estate by stating, among other things, that the lots could easily be resold in a short period of time for a profit.

42. TRM also induced individuals to purchase the unimproved real estate by offering up-front financial incentives, including no money out of pocket for the purchasers and a "rebate" of one to two years of mortgage interest payments from TRM.

43. Jalajel instructed the employees and agents of TRM concerning the presentation of sales and marketing information to inexperienced real estate purchasers.

44. Jalajel determined the purchase prices for the lots TRM sold and the amount of the rebate given to purchasers after settlement, and were assisted by others.

45. The marketing materials disseminated to potential purchasers list the combined real estate experience of Jalajel as selling points regarding the lots.

46. Jalajel intentionally misled Plaintiffs regarding the value of various real estate investments with the intent that Plaintiffs would rely upon their material misrepresentations.

47. Jalajel made false representations to Plaintiffs that they would receive a quick financial return on their real estate investment.

48. Jalajel made false representations to Plaintiffs that TRM would be conducting sales activity in the Subdivisions for years to come and may buy back the lots which Plaintiffs anticipated purchasing.

49. TRM did buy back some lots they sold in third parties, allowing select purchasers to make some profit, but mainly so that such purchasers would then provide testimonials about TRM to subsequent lot purchasers.

50. Jalajel made false representations to Plaintiffs that TRM owned the lots in the Subdivisions that it was selling, and at the time representations were made to Plaintiffs, Jalajel knew that these statements were false and inaccurate, intended to deceive Plaintiffs, and intended that Plaintiffs rely upon these misrepresentations.

51. Jalajel intentionally misled Plaintiffs, claiming that TRM purchased lots in bulk, and at the time he made these material misrepresentations to Plaintiffs, he knew that these statements were false and inaccurate, intended to deceive Plaintiffs, and intended Plaintiffs to rely upon these misrepresentations.

52. Jalajel made representations to Plaintiffs that TRM had negotiated discounted prices for the lots with others, and at the time these false representations were made to Plaintiffs, Jalajel knew that these statements were false and inaccurate, intended to deceive Plaintiffs, and intended Plaintiffs to rely upon these misrepresentations.

53. Jalajel represented to Plaintiffs that TRM purchased lots in the Subdivisions at "50 cents on the dollar" and passed onto Plaintiffs through incentives "30 cents on the dollar," and at the time TRM Representatives made these material misrepresentations to Plaintiffs, TRM Representatives knew that these statements were false and inaccurate, intended to deceive Plaintiffs, and intended Plaintiffs to rely upon these misrepresentations.

54. Jalajel failed to disclose to Plaintiffs that TRM, Dain and Jalajel were directly

involved in sham transactions designed to create inflated appraisals of the lots TRM sold.

55. TRM sold each lot for approximately twice the price TRM paid for each lot.

56. TRM Representatives knew that the purchase prices paid by its purchasers for lots were far in excess of the fair market value of the lots.

57. Jalajel knew that the purchasers could buy the same or comparable lots directly from R.A. North for prices comparable to prices which TRM had paid.

58. Upon information and belief, TRM used cash to make initial lot purchases in the Subdivisions at more than the lots' fair market value, so that these purchases could then form the basis of appraisals for TRM's lot sales at inflated prices to Plaintiffs and other purchasers.

69. Jalajel did not disclose to Plaintiffs that TRM funded most or all of its purchases of the lots it sold to Plaintiffs with funds provided by Plaintiffs' lenders.

60. TRM Representatives informed some Plaintiffs that TRM used the purchasers' loans for TRM's investment to limit TRM's financial outlay and risk exposure.

61. TRM resold (flipped) the lots it purchased in Summerhouse by selling the lots to Plaintiffs on the same day TRM purchased the lots.

62. TRM resold some lots multiple times (double flips) to set up its marketing based on testimonials. In these instances, a few months after the first flip, TRM repurchased the lots and then immediately flipped the lots again by selling them to other purchasers. Even in setting up the testimonials, TRM made sure it resold the lots it repurchased, so that TRM would not be stuck owning overvalued lots. In some instances, TRM even willingly took a small loss on a second sale just to be sure to get rid of the lots.

63 Each Plaintiff purchased a lots immediately after TRM purchased the lots.

64. TRM held itself out as a provider of a complete package of real estate services, including not only being the seller, but also being the real estate agent, mortgage broker,

settlement service provider, and notary.

65.     TRM informed Plaintiffs that TRM would simplify the purchase, and thereby provide valuable services to Plaintiffs, by bundling services relating to the real estate transaction under the name "Total Realty Management."

66.     TRM made these representations to potential purchasers. TRM also gave the false impression to Plaintiffs that it was an established real estate development/investment firm, when in fact it was a start-up venture which had been dormant since its formation in 2003, but which came to life in the late winter and spring of 2006.

67.     TRM made representations to Plaintiffs that TRM was acting as their Realtor, and at the time TRM made these material misrepresentations to Plaintiffs, TRM knew that these statements were false and inaccurate, intended to deceive Plaintiffs, and intended Plaintiffs to rely upon these misrepresentations.

68.     TRM performed services of a mortgage broker to finance the lots, even though they were not licensed mortgage brokers.

69.     TRM exercised all functions of a mortgage broker or agent of the lenders: they solicited Plaintiff's loan applications, received Plaintiffs' financial documentation, prepared Plaintiffs' loan applications, pulled Plaintiffs' credit reports, pre-qualified Plaintiffs as borrowers, selected which bank to use for each Plaintiffs' loan, solicited mortgage loans on behalf of Plaintiffs, negotiated terms of loan applications for Plaintiffs, handled all communication with the banks, reviewed the terms of the loans, reviewed acceptances and declinations from the banks, investigated and negotiated alterations in the banks' reasons for declination, and otherwise handled all aspects of financing of Plaintiffs' lot purchases.

70.     TRM assured Plaintiffs that TRM would process and submit their loan applications.

71. TRM instructed its' employees and agents that purchasers were not to make direct contact with any lenders which financed the purchases of any lots.

72. TRM informed potential purchasers that if they did not submit their loans through TRM, then they could not purchase through TRM.

73. TRM communicated with appraisers and informed the appraisers that they were not to communicate with the purchasers.

74. TRM informed potential purchasers that the sole criterion for loan qualification to purchase the lots was a good credit score. TRM advertised that even unemployed "housewives" could be approved for a loan.

75. TRM Representatives conducted the settlements by arranging for the purchasers to sign the documents at locations including TRM's office or at such locations as in a car at a gas station, a truck in a school parking lot, a golf course, purchasers' homes, a school classroom between classes, and other places of employment of the purchasers. Most of these "settlements" lasted less than 15 minutes, and Plaintiffs were merely told where to sign (usually indicated by sticky) without explanation or dialogue.

76. TRM made representations to potential purchasers that TRM was providing a 10% equity position to purchasers of the Subdivision lots, and at the time TRM made these material misrepresentations to Plaintiffs, TRM knew that these statements were false and inaccurate, intended to deceive Plaintiffs, and intended Plaintiffs to rely upon these misrepresentations.

77. TRM made representations to some potential purchasers that TRM was providing a 20% equity position for the purchasers of Summerhouse lots. When TRM made these material misrepresentations to Plaintiffs, TRM knew that these statements were false and inaccurate, intended to deceive Plaintiffs, and intended Plaintiffs to rely upon these misrepresentations.

78. Instead of giving Plaintiffs a 20% equity position as promised, TRM had some Plaintiffs execute documents providing for second mortgage financing by TRM in the amount of 20% of the purchase price, but in most instances TRM did not inform Plaintiffs who executed such documents that they were signing second trust financing, and Plaintiffs were unaware that they were signing such documents.

79. TRM's promotion of the scheme included the distribution of promotional material by hand as well as distribution through the use of the internet, the mails, the telephone, word of mouth, and seminars. In advertising and promotions, TRM Representatives enticed potential purchasers into purchasing unimproved lots by highlighting its significant sales of lots in Summerhouse, using similar financial incentives and touting the investment potential of the lots.

80. TRM created a sense of urgency for Plaintiffs to purchase quickly by making representations to Plaintiffs that lots were almost sold out, when no such lots had sold, and at the time TRM made these material representations to Plaintiffs, TRM knew that these statements were false and inaccurate, intended to deceive Plaintiffs, and intended Plaintiffs to rely upon these misrepresentations.

81. TRM Representatives encouraged Plaintiffs to buy more than one lot.

82. TRM Representatives encouraged Plaintiffs to buy multiple lots close in time to one another, using different banks.

83. TRM Representatives submitted loan applications for Plaintiffs to multiple banks simultaneously without Plaintiffs' knowledge or consent.

84. TRM Representatives included the lump-sum payment received for the first purchase among the Plaintiff's assets when applying for subsequent lot loans, to help ensure that Plaintiffs would qualify for the subsequent lot loan.

85. TRM's marketing plan included holding formal seminars ("Seminars") where

TRM made presentations, and individuals who made money through TRM gave testimonials.

86. The Seminars purported to provide attendees with little to no real estate investment experience with an opportunity to invest in real estate.

87. To entice purchasers, the Seminars were often elaborate and included video presentations, large maps of Summerhouse, colorful brochures, and free catered food and alcohol. At the Seminars, TRM presented individuals who had previously purchased and resold lots though TRM.

88. TRM's business model included repurchasing some of the lots initially sold, allowing the purchasers to profit, and then recruiting these purchasers to become agents and spokespersons of TRM.

89. One individuals TRM Representatives intentionally recruited to become an agent and spokesperson for TRM was Daniel Meier, the principal of Robinson Secondary School.

90. TRM Representatives recruited Daniel Meier to give credibility to TRM's business, to operate as TRM's agent, and to present TRM's investment model to colleagues, teachers, administrators and athletic coaches, as well as to other potential purchasers. Daniel Meier's role with TRM was to ignite interest regarding lot purchase opportunities through TRM.

91. Daniel Meier, viewed as a pillar of the community, repeatedly attended Seminars and informed potential purchasers that he made approximately $60,000 through TRM in only a few months, and recommended that they purchase so that they could similarly profit. The implication of "Danny's Story," as it came to be called, who specifically utilized it as a favorite marketing technique, was that Daniel Meier made a lot of money with TRM and that anyone could, too. Danny's Story was presented as a unique, zero cash out-of-pocket opportunity for anyone, who had moderate income and limited cash available and therefore had missed out on the real estate boom, but who were "qualified" for this program with their good credit ratings.

92. TRM Representatives also recruited Daniel Meier's brother, Tommy Meier, an assistant principal at Langley High School to give credibility to TRM's business, to operate as TRM's agent, and to present TRM's investment model to others.

93. TRM's scheme was lent an air of legitimacy by the involvement of Daniel Meier and Tommy Meier.

94. In making their decision to purchase the lots from TRM, potential purchasers relied on the involvement of Daniel Meier and Tommy Meier.

95. TRM requested that Daniel and Tommy Meier limit the direct communications between purchasers and TRM, and that Daniel and Tommy Meier operate as points of contact regarding purchases.

96. TRM had created property reports ("Property Reports") for the lots to be sold pursuant to the Interstate Land Sales Transfer Full Disclosure Act (the "Act.").

97. The Property Reports for Summerhouse did not contain disclosures about TRM's business plan, marketing plan and financial incentives.

98. The intentional omissions from the Property Reports presented to those Plaintiffs who received Property Reports would have been important to a reasonable purchaser.

99. By virtue of the intentional omissions from the Property Reports, the Property Reports constituted false statements.

100. A critical and indispensable component of the scheme was the participation of various entities in facilitating and orchestrating the scheme along with TRM.

101. TRM cloaked the scheme with legitimacy lent by the involvement of seemingly sophisticated and reputable persons and entities.

102. After enticing Plaintiffs to purchase lots, Jalajel, or others acting upon his directions and/or instructions, originated, facilitated, and arranged for Plaintiffs' financing with

various banks.

103.   Jalajel's scheme was lent an air of legitimacy by the involvement and association of, as well as the promotion of the scheme by, the various well-known lenders.

104.   Jalajel orchestrated and facilitated TRM's business scheme by obtaining and relying upon false appraisals for mortgage loan commitments.

105.   Jalajel engaged in deceptive acts by in the sale of lots to Plaintiffs, by among other things: (a) soliciting and obtaining false appraisals; (b) failing to use truthful and accurate HUD-1 Settlement Statements; (c) using deceptive and untruthful testimonials; (d) using deceptive and false advertising; (e) intentionally misrepresenting the values of lots to Plaintiffs; (h) failing to inform Plaintiffs of the actual value of these lots; (i) failing to inform Plaintiffs of the amount TRM paid for these lots; and (f) intentionally misrepresenting that TRM received a discounted price by purchasing these lots.

106.   Jalajel represented to Plaintiffs that a TRM resell or repurchase program is in place, when no ongoing resell or repurchase program existed.

107.   Based upon the false statements of Jalajel, Plaintiff signed a contract(s) with TRM and/or Legacy Development SG Group, LLC ("LDSCG") to purchase of a lot and closed upon such contract as follows: (a) Tanner purchased Lot 785 in Summerhouse; (b) the Quiggs purchased Lot 783 in Summerhouse; (c) the Warrens purchased Lot 489 in Summerhouse; (d) Pilla purchased Lot 34 in Summerhouse; (e) the Violas purchased Lots 500 and 430 in Summerhouse; Lot 227 in Cannonsgate; and Lot 9 in Legacy Estates; (f) Day purchased Lot 725 in Summerhouse and Lot Number 44 in Legacy Estates; (g) the Cognettis purchased Lot 856 in Summerhouse; (h) Ford purchased Lot 228 in Cannonsgate; and Lot 89 in Legacy Estates; (i) the Goddards purchased Lot 534 in Summerhouse; (j) the Dugans purchased Lots 349 and 351 in Summerhouse; (k) the Mikoalajyczks purchased Lot 718 in Summerhouse; (l) Balducci

-14-

purchased Lot 258 in Summerhouse; (m) the Pugsleys purchased Lot 774 in Summerhouse and Lot 51 in Legacy Estates; (n) the Blakes purchased Lot 851 in Summerhouse; (o) Christina purchased Lot 850 in Summerhouse; (p) Martin purchased Lot 7 in Legacy Estates; (q) Hooten purchased Lot 10 in Legacy Estates; (r) Harris purchased Lot 12 in Legacy Estates; (s) Hurlihy purchased Lot 11 in Legacy Estates; (t) Sartoph purchased Lot 649 in Summerhouse; (u) Anderson purchased Lot 6 in Legacy Estates; (v) Phelps purchased Lot 724 in Summerhouse; and (w) Petruzzi purchased Lot 713 in Summerhouse.

108. The actions of TRM alleged herein would not have taken place but for the direct supervision, direction, and involvement of Jalajel in the activities of TRM.

109. No Plaintiff would have purchased one or more lots from TRM and/or LDSCG but for the direct supervision, direction, and involvement of Jalajel in the operations of TRM.

110. Each Plaintiff who purchased one or more lots from TRM and/ or LDSCG as a result of the acts of Jalajel suffered damages in an amount equal to: (a) the difference between the purchase prices of the lot(s) purchased and the true fair market value; market value; and (b) the carrying costs of the lot(s) purchased, offset by the carrying costs provided by TRM, if any.

111. Upon information and belief, LDSCG was a joint venture between TRM and others, one or more of which/whom is believed to be Ron LeGrand.

112. Lots in Legacy Estates which were sold to Plaintiffs, although sold nominally by LDSCG, were sold through and by operation of the plans, schemes, devices, and procedures manufactured, concocted, orchestrated, and choreographed by Jalajel. Upon information and belief, LDSCG is either a disregarded or pass through entity.

113. Plaintiffs which purchased Lots in Legacy Estates had no direct contact with LDSCG, all such contacts came through TRM.

114. As a result of the sale of a lot by TRM [acting directly or indirectly through

LDSCG], and as a result of Jalajel's financial interest in TRM: (a) the sales proceeds available to TRM; and (b) the infusion of capital into TRM resulted in a benefit to Jalajel. As to Jalajel, the sales proceeds to TRM and the infused capital constitute "money" or "property" within the meaning of 11 U.S.C. § 523(a)(2)(A) and (B).

### COUNT ONE - VIOLATION OF 11 U.S.C. § 523(a)(2)(A)

115.    The prior allegations of this Complaint are incorporated by this reference as if set forth at this point.

116.    Jalajel obtained money or property from Plaintiffs by, through, and as a result of false pretenses, false representations, and actual fraud.

117.    As a result of the foregoing, Jalajel obtained money or property from each Plaintiff in violation of 11 U.S.C. § 523(a)(2)(A).

118.    The debt owed by Jalajel to each Plaintiff is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

WHEREFORE, Plaintiffs, pursuant to 11 U.S.C. § 523(a)(2)(A), request that this Court enter an order granting judgment against Jalajel in an amount consistent with any evidence which may be adduced [but in no event less than $400,000 per lot purchased], with interest; together with a judgement that the debt owed by Jalajel to each Plaintiff is non-dischargeable; and granting Plaintiffs their costs any other and further relief which may be appropriate.

### COUNT TWO - VIOLATION OF 11 U.S.C. § 523(a)(2)(B)

119.    The prior allegations of this Complaint are incorporated by this reference as if set forth at this point.

120    Jalajel obtained money or property from Plaintiffs by, through, and as a result of false pretenses, false representations, and actual fraud.

121.    Jalajel obtained money or property from Plaintiffs by, through, and using

statements in writing - falsified Property Reports - that were materially false, respecting the financial condition of TRM upon which each Plaintiff reasonably relied, and which Jalajel made or caused to be published with the intent to deceive.

122    As a result of the foregoing, Jalajel obtained money or property from each Plaintiff in violation of 11 U.S.C. § 523(a)(2)(B).

123.    The debt owed by Jalajel to each Plaintiff is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

WHEREFORE, Tanner, the Quiggs, the Warrens, the Violas' [but not as to any claim against Jalajel for their purchase of a Lot in Legacy Estates], Day [but not as to any claim against Jalajel for her purchase of a Lot in Legacy Estates], the Cognettis, Ford [but not as to any claim against Jalajel for his purchase of a Lot in Legacy Estates], the Goddards, the Dugans, the Mikoalajyczks, the Pugsleys [but not as to any claim against Jalajel for their purchase of a Lot in Legacy Estates], Balducci, the Blakes, Christina, Stroph, Phelps, and Petruzzi, pursuant to 11 U.S.C. § 523(a)(2)(B), respectfully request that this Court enter an order granting judgment against Jalajel in an amount consistent with any evidence which may be adduced [but in no event less than $400,000 per lot purchased] with interest; together with a judgement that the debt owed by Jalajel to each Plaintiff is non-dischargeable; and granting Plaintiffs their costs any other and further relief which may be appropriate.

## JURY DEMAND

125.    Plaintiffs demand trial by jury as to all issues presentable to a jury for determination.

Respectfully submitted by:

*/s/ John P. Forest, II*
John P. Forest, II, VSB# 33089
[email: jforest@stahlzelloe.com]
STAHLZELLOE, P.C.
11350 Random Hills Road, Suite 700
Fairfax, Virginia 22030
Telephone: (703) 691-4940
Facsimile: (703) 691-4942
Counsel for Michael J. Tanner, Joseph P. Quigg, Renee M. Quigg, William K. Warren, Susan O. Warren, Melissa D. Pilla, Brian J. Viola, Tammy A. Viola, Jule Day, Christopher Cognetti, Michelle Cognetti, Kevin Ford, John Goddard, Pamela Goddard, Carl Dugan, Erin Dugan, Sharon Mikolajyczk, Todd Mikoalajyczk, Ray Pugsley, Cathy Pugsley, Roger Balducci, Ed Blake, Mary Ellen Blake, Christina Blake, Chris Martin, Theodore Hooten, Michael Harris, John R. Hurlihey, Max Sartoph, Bret Anderson, Kevin Phelps, and David Petruzzi